## Hattie H. Murray

### *v.*

### Veronica Pannaci et al.

[Filed November 11th, 1902.]

Where it appears that the excavation of sand from a portion of the seashore by the owner thereof will, by the laws of gravitation and by wave motion, result in the removal of adjoining soil of another, and that such latter removal will expose the land of a third party to the action of the waves, the third party is entitled to an injunction restraining the excavation.

*Mr. John T. Bird,* for the complainant.

*Mr. Frank P. McDermott,* for the defendants.

Reed, V. C.

This bill is filed by Mrs. Murray, the complainant, to have the defendant Mrs. Pannaci restrained from excavating and carting away sand from the seashore in front of the properties of the complainant and defendant.

The parties own adjoining land bordering on the Atlantic ocean at Seabright. The relative situation of the tracts appears from the following rough plan:

The lot of the complainant is protected by a bulkhead, situated some distance inland from the ordinary high-water mark. The ordinary high-water mark is from forty-six to fifty-six feet easterly from the bulkhead. The property of the defendant is not so protected. Upon the defendant's property is a row of bathhouses, beginning outside the line of ordinary high-water mark and running back eighty or ninety feet.

The evidence discloses the fact that Mrs. Pannaci has caused sand to be taken, not only from the beach in front of Mrs. Murray's, but large quantities have been removed from the shore in front of her own property, and sold for filling purposes elsewhere. The claim of the complainant is that the removal of this sand has lowered the beach in front of her property, and destroyed the protection which its presence gave to her upland.

The defendant, while admitting that sand was taken from the shore in front of Mrs. Murray's property, disclaims any right to do so, and any intention in the future to do so. The present contest is confined to the right of the defendant to excavate and remove sand from the shore in front of her own property.

Murray *v.* Pannaci.

It is to be remarked that the defendant holds a riparian grant from the state for the shore in front of her property. The complainant has no such grant.

The defence is rested upon three grounds—*first,* that the defendant is using her property for natural and reasonable purposes; *second,* that the removal of such sand works no injury to the complainant, because the sand taken is almost immediately replenished by the action of the waves; *third,* that if any injury results to the complainant, it is *damnum absque injuria.*

In respect to the first ground, the testimony seems to show that, in many instances, sand has been removed from the beach by others, mainly for the purpose of filling in and building up lowlands along the coast. This has been so frequent that it may be said to have been a customary act to take sand, not only from in front of the taker's own property, but elsewhere. The evidence, however, only shows that other persons have taken, from time to time, more or less sand from the beach, without having their right to do so challenged by a riparian owner. No local custom or common law conferring such a right upon citizens at large or the owners of riparian grants is proved to exist in instances where the taking of sand results in substantial injury to other property.

The second ground of defence, as already remarked, is that the sand excavated during the day is restored by the next high tide, and that there is no appreciable permanent depression of the beach following such excavations.

The defendant struggled to support the theory that the places from which the sand was removed were filled up by sand which the ocean waves brought in from the ocean floor and from distant points.

It is undoubtedly true that storms, with their high winds and consequent high waves, effect wonderful changes along the coast. Winter tempests sometimes form hills of sand at one point and sweep it away entirely from another point. This, however, is exceptional. The action of ordinary tides is a leveling process, sweeping the loose particles of comminuted stone from the higher and lodging them in the hollow places of the beach. It seems too obvious for discussion that if the sand from one

point is removed day after day, leaving capacious cavities, these pits will be filled principally at the expense of the neighboring beach; and so it will result in a depression of the vicinage. That the large quantities of sand removed by the defendant resulted in lowering the beach in front of the complainant's property I have no doubt whatever. It removed the barrier which nature had placed in front of her property, and left it more and more to the mercy of the ocean tides. It practically caused the line of ordinary high tide to move landward at that point, and thus diminish the area of the complainant's property.

Assuming that the acts of the defendant threaten to remove the protection which the natural accumulation of sand afforded to the property of the complainant, and so menaces her property, the third question supervenes: Has she a legal right for complaint?

I think the sand was taken almost entirely outside of the ordinary high-water mark of the ocean. Although it was taken from under the outer end of the range of bath-houses upon the Pannaci property, yet they projected beyond the present ordinary high-water mark.

As I have already remarked, for the land in front of Mrs. Murray's property, outside of the ordinary high-water mark, she has no grant, the title for it being still in the State of New Jersey.

It is true that it is insisted that the title of the complainant runs to the low-water mark of the Atlantic ocean. A deed from the Wardell heirs, executed October 28th, 1865, is in evidence, which deed conveys to Arthur V. Conover a tract of land, including, it is alleged, the *locus in quo* to the Atlantic ocean at low-water mark. It is insisted that this description, coupled with acts of possession for over twenty years, carries complainant's title below the line of ordinary high-water mark down to low water. This position, however, is not tenable. If the grantees under the Wardell deed could have obtained title against the state below ordinary high-water mark by adverse possession, under the provision of our act for the limitation of actions (*Gen. Stat. p. 1978* § *27*), such a possibility is of no use to the complainant, for several reasons:

*First,* there is no evidence of such acts of adverse possession by the grantees in the Wardell conveyance to low-water mark; *secondly,* the chain of title does not connect Conover, the grantee of Wardell, with the Seabright Beach Club, the grantor to Mrs. Murray; *thirdly,* if the title of the beach company ran to low-water mark, its deed does not convey, by proper words, any title below ordinary high-water mark. So I must assume that Mrs. Murray's title runs to the line of ordinary high tide, wherever that may be. But assuming that the title to the foreshore is in the state, or even that it was in the defendant, nevertheless, if the defendant had removed the sand in front of the complainant's lot along the ordinary high-water mark, so that, by gravity or by the action of the waves or other natural causes, the land of the complainant's above that line would have been swept away by reason of the absence of the remaining sand, it seems to me there could be no question of the defendant's liability.

In England a party who collects or conducts water in upon his land is responsible for its escape upon, and its damage to, neighboring land, irrespective of any degree of care exercised to preclude such a consequence.

In this state he is liable for a similar result for a like act, unless such a degree of care is used to prevent damages as will relieve the collector from the charge of negligence.

No one, I think, will question the proposition that, if a landowner digs a canal, by which water from a river or from the ocean is brought upon his land, without taking any precaution to confine the water to his land, he will be liable for its escape and for any injury inflicted upon other property.

In England, in the case of *Attorney-General* v. *Tomline, 5 Ch. Div. 750,* an injunction was decreed to prevent the owner of a foreshore from removing shingle, so as to expose the complainant's land to the inroads of the sea, although the shingle was removed for sale in the natural and ordinary use of the land. The injunction was allowed upon the theory that it was the duty of the crown to protect the realm from the inroads of the sea; therefore, no subject was entitled to destroy the natural barriers against the sea. In this case the attorney-general was merely asserting the *jus privatum* of the crown in the land, and

admittedly stood as any other private owner of land abutting on the foreshore. This case was affirmed by the court of appeals, upon the ground stated. *S. C., 14 Ch. Div. 58*. Is the doctrine of this case applicable in this state?

The right of control and of dominion over the sea, its coasts and tide-waters, when relinquished by a foreign country, vested somewhere, and, as between the several states and the federal government, it is settled that it vested in the several states in their sovereign capacity, respectively. *Commonwealth* v. *Alger, 7 Cush. 53, 82; Pollard* v. *Hagan, 3 How. 212; Arnold* v. *Mundy, 1 Halst. 1.*

"The legislature," said Chief-Justice Kirkpatrick, in the last case, "may lawfully bank off the waters and reclaim the land upon the shores at public expense."

As the royal right in the coast and waters of this state, after the Revolution, became vested in the people of the state, represented by the legislature, so it would seem that the royal duties, in respect to these shores and waters, then existing, devolved upon the people of the state, including the duty (imperfect, because unenforceable against the state, as it was against the crown) of preserving the land of the state against the inroads of the ocean.

The supreme court of Massachusetts has, upon more satisfactory grounds, laid down the rule that a person who excavates on his land in such a manner as to let in the sea, which undermines and injures the adjoining land of another, is liable for the injury so caused. This result was reached upon the reasoning of Chief-Justice Shaw, in his opinion in *Commonwealth* v. *Alger, 7 Cush. 53, 86.*

In that case the defendant, having title to low-water mark, violated a statute which limited the lines to which a wharf could be extended. The question was whether this statute was an infringement of the vested rights of the owner of the shore. In his opinion in that case Chief-Justice Shaw said: "All real estate, inland or on the seashore, derived immediately or remotely from the government of the state, is taken and held under the tacit understanding that the owner shall so deal with it as not to cause injury to others; that when land is so situated, or such

is its conformation that it forms a natural barrier to rivers or tidal water-courses, the owner cannot justifiably remove it to such an extent as to permit the waters to desert their natural channels and overflow and, perhaps, inundate fields and villages; render rivers and harbors shallow, and consequently desolate and thereby destroy the valuable rights of other properties, both in the navigation of the stream and in the contiguous lands."

Again, he said: "Ordinarily, and when no such circumstances exist, the owner of the land has a perfect right to use and remove the earth, gravel or clay of which the soil is composed, as his own interest or convenience may require. But can he do this when the same materials form the natural embankment of the water-course? He may say, perhaps, that he merely intends to make use of materials which are his own, and to which he has the right, and for which he has other uses. But we think the law will admit of no such excuse. He knows that when those materials are away the water, by law of gravitation, will rush out, and all the mischievous consequences of diverting a water-course will follow."

In the case of *Mears* v. *Dole, 135 Mass. 508,* the plaintiff and defendant owned lands adjoining by the sea, the land of the defendant being bounded easterly and northeasterly and, in part, northwesterly by the land of the plaintiff. Part of the complainant's land extended between the defendant's land and the sea. The defendant excavated and carried away, for sale, the soil and gravel from his land down to low-water mark for a considerable distance inland, and near the line of the plaintiff's land, but not so near (except for the action of the sea) that his land would have been undermined and would have fallen in. The consequence of the excavation was that, through the action of the sea, the plaintiff's land was undermined and washed into the excavation of the defendant.

The court said, after citing the language of Chief-Justice Shaw, already displayed: "The defendant, by his excavations on his own properties, brought the sea upon his land, where it would not have been but for the excavations; and, as a consequence, it has escaped and acted upon the plaintiff's land so as to cause damage, and for this he must be held responsible."

The principle thus enunciated is, in my judgment, sound. It is applicable to the present case, where the sand has been removed in such quantities as to produce a substantial injury, and no precautions were taken to prevent the resulting damage. If the property from which the sand was taken had adjoined the land of the complainant, the application of the doctrine to the facts of this case would be at once manifest.

The question remains whether the fact that the place of excavation adjoins lands of the state, and not the lands of the complainant, deprives the complainant of her right to redress.

If the act of the defendant resulted in a material injury to the land of the complainant, and such injury was the proximate and reasonable result of such act, I am of the opinion that the complainant is entitled to relief. Adjacency is not the ground upon which protection to property for such acts rest. The rule to be applied is analogous to that underlying the doctrine of lateral support. The liability of an excavator is not limited to the injury done to the adjacent owner, but includes any injury to any owner of land within the zone of support. *Birmingham* v. *Allen, L. R. 6 Ch. Div. 284; Keating* v. *Cincinnati, 38 Ohio St. 141; Gillmore* v. *Driscoll, 122 Mass. 199.*

In the present case, if it be conceded that the owner who brings the ocean upon his land is responsible for its effects upon other land, it must follow that the responsibility includes any land an injury to which is the proximate result and reasonable sequence of such conduct.

To put the proposition in a shape better fitting the facts of this case: If the excavation of the soil by the defendant was so great that, by the law of gravitation or of wave motion, it resulted in the removal of the adjoining soil, and the removal of this soil exposed the property of a third party to the erosive action of the ocean, then, if the last result was the reasonable and proximate sequence of the original act, the excavator is liable for the ultimate event.

I will advise a decree for the complainant.