# DAVID ORTH KLAUSMEYER AND MARIE BLACK-WELL KLAUSMEYER *v.* MAKAHA VALLEY FARMS, LTD., MAKAHA BEACH CO., LTD., WAIANAE VILLAGE PROPERTIES, LTD., AND CAPITAL INVESTMENT CO., LTD.

## NO. 2956.

ARGUED MARCH 9, 1955.　　　　　DECIDED JANUARY 26, 1956.

TOWSE, C. J., STAINBACK AND RICE, JJ.

OPINION OF THE COURT BY RICE, J.

This is an appeal from a decree of a judge of the circuit court, first circuit, at chambers, in equity, acting and hereinafter referred to as "chancellor," dismissing a bill in equity for an injunction, which was filed by the petitioners-appellants, hereinafter referred to as the "petitioners," against the respondents-appellees, hereinafter referred to as the "respondents."

David Orth Klausmeyer and Marie Blackwell Klausmeyer, the petitioners, are husband and wife. They have sought by their bill to have the respondents, and each of them, Makaha Valley Farms, Ltd., Makaha Beach Company, Ltd., Waianae Village Properties, Ltd., and Capital Investment Company, Ltd., Hawaiian corporations, "their affiliates, subsidiaries, servants, assignees, officers and employees," enjoined and restrained "from the removal of sand from the beach" of a parcel of land ("Lot K-1-A"), owned by respondents, "immediately adjoining" a beach lot ("Lot 196"), owned in fee simple by the petitioners, as tenants by the entirety, alleging that "* * * the removal of sand from the beach of said parcel of land adjoining petitioners' said lot 196 will cause irreparable damage to petitioners in that the removal of * * * large quantities of sand by respondents will cause a shifting of the sand from petitioners' said * * * land in order to fill in the area from which respondents have removed the sand * * *."

At the time of the filing of the petitioners' bill, on April 11, 1953, Judge Ronald B. Jamieson granted an ex-parte temporary restraining order, prohibiting the respondents from removing sand in commercial quantities from "the beach and property described in the petition."

On April 20 the respondents filed a motion to dissolve said restraining order and such motion was heard on April 22. At that time the court, to wit, the Honorable Wilford D. Godbold, judge presiding in equity, who thenceforth as chancellor, presided at all hearings and exercised jurisdic-

tion over all proceedings in the instant matter, modified the temporary restraining order to the extent that the respondents were allowed to remove sand in commercial quantities from within the boundary lines of their own property, but were restrained from removing sand from the area below high water mark. Therefore, under the modified order the respondents were not prohibited from proceeding in connection with the removal of sand for the purpose of complying with an allegedly pending contract.

On April 23, 1953, the respondents Makaha Valley Farms, Ltd., Capital Investment Company, Ltd., and Waianae Village Properties, Ltd., filed answers in the proceedings. It was alleged in the answers filed that the fourth named respondent, the Makaha Beach Company, Ltd., "neither is nor was at any time mentioned in the said petition as a corporation existing under the laws of the Territory of Hawaii or otherwise." Also, the said Makaha Valley Farms, Ltd., by its answer denied that it had or at any time mentioned in the petition had any right of control over the property referred to in the bill of complaint. Further, it denied the removal by it of any sand or other material, and also denied that it had any intention of removing sand or other material from the premises described in the petition.

The respondent Capital Investment Company, Ltd., admitted "the purchase by the Petitioners of Lots 195 and 196 from MAKAHA BEACH COMPANY, LTD.," as alleged in paragraphs II and III of the petition (which admission was erroneous as to paragraph II of the petition and as to lot 195, purchased from Makaha Valley Farms, Ltd.), but alleged that it had no knowledge that the petitioners in purchasing their said lots were beach properties. This respondent, Capital Investment Company, Ltd., further admitted that it had the management and control of the land and property of the Waianae Village

Properties, Ltd., and that, as managing agent of the properties of said Waianae Village Properties, Ltd., it had recently removed for commercial purposes "Three Hundred (300) yards of sand from property owned by the said Waianae Village Properties, Ltd., at a point above high water and approximately Six Hundred (600) feet from the nearest boundary of said petitioners' lots and *it is the intent and purpose of this Respondent to remove additional sands from said area all of which is within the boundary of property owned by the said Waianae Village Properties, Ltd., and which this Respondent has a legal right to remove;* * * *." (Emphasis added.)

The answer of the respondent Waianae Village Properties, Ltd., contained identical admissions and denials as those contained in the answer of the respondent Capital Investment Company, Ltd.

A replication to such answers was duly filed by the petitioners on April 28.

It appears from the record submitted to this supreme court, and so it is noteworthy, that after petitioners had introduced a great deal of evidence on their behalf and then rested, the respondents filed, in open court in the proceeding before the chancellor, on June 23, 1953, a "MOTION TO DISMISS," and thereby moved that the petition filed by the petitioners be dismissed upon the grounds that: (I) "said petition does not show any cause of action whereby said Petitioners are entitled to the relief prayed for therein;" (II) "said petition does not allege that the said Petitioners have suffered any injury arising out of any acts on the part of said Respondents, or any of them to entitle said Petitioners to the relief prayed for in said petition;" (III) "said Petitioners have utterly failed to prove by competent evidence that they have suffered any injury arising out of any acts on the part of said Respondents, or any of them;" (IV) "said

Petitioners have utterly failed to prove by competent evidence that they have suffered any damages arising out of any acts on the part of said Respondents, or any of them;" and (V) "said Petitioners have utterly failed to prove by competent evidence that they are entitled to any relief whatsoever in equity as against said Respondents, or any of them."

The said motion to dismiss was denied, the chancellor saying: "The court at this time is not going into the merits of the case, or attempt to weigh the preponderance of the evidence one way or the other, but the court does find that the petitioner has alleged a cause of action, and the court further finds that the proof has established not only a threatened injury but a prima facie showing, — strike the word 'established' — the petitioner has made a prima facie showing that there has occurred and had occurred, prior to the time that the case was filed, damage and injury to the petitioners by the evidence that the petitioner produced. There was a prima facie showing [of] the shifting of sand from one area to the other. There was a showing that upon the removal of sand from Lot K-1-A, that that would affect the area all up and down the cove. It is true that there was no showing that any damage or injury has manifested itself as yet. However, the court believes that the petitioner has established a prima facie case, and for that reason will deny the motion to dismiss."

It was thereafter that the respondents introduced evidence on their behalf and subsequently evidence for rebuttal was introduced by the petitioners.

The several questions which have been raised herein by the pleadings and contentions of the parties present one principal issue which is: when there has been a subdivision of an area at a cove and sale of lots thereof as beach lots by certain of the respondents; petitioners have purchased and acquired fee-simple title to two of such lots, composed

of sand, have built and occupy as their home a substantial dwelling house, erected upon pillars, as foundations, sunk into and resting upon sand, on one of the lots, which adjoins a lot likewise composed of sand, being the only one of said subdivision unsold and retained by respondents; which lots of petitioners and of respondents, respectively, are at times washed by waves breaking along the shore of the cove; is the — commercial, or other — removal of thousands of cubic yards of sand and activity indicative of continuance of removal of additional large quantities from the respondents' lot, by or with the authorization of respondents, so likely to cause irreparable injury and damage to the petitioners' adjoining lots, particularly the one on which their dwelling house is situated, as to sustain a bill for injunction by the latter to restrain further commercial removal of sand from the lot of respondents?

The chancellor resolved the issue adversely to the petitioners.

An appeal in equity — as likewise in divorce — brings the entire record up for scrutiny and review and the findings of fact made by the trial judge are not binding on this court. Generally, when the evidence is conflicting and the findings depend upon the credibility of witnesses and the weight of oral testimony, great weight will be given by this court to the findings of the trial judge.

However, in the instant matter, the evidence introduced below included not only oral testimony, but also a great number of photographic and other exhibits; the findings of the trial judge, or chancellor, as set forth in his decision, amount to little more than a statement of his ultimate conclusion, without comment indicative of the relative credibility accorded by him to the testimony of the witnesses, severally, and weight given by him to the exhibits. Therefore, this court has found it necessary to examine the evidence, evaluate same and draw its own conclusions

therefrom. An impelling reason that this court should do so was the failure of the chancellor to state in his final decision whether, or wherein, he found that evidence introduced by the respondents had overweighed the evidence which had previously been introduced by the petitioners and which he had — at the time of overruling respondents' motion to dismiss, as set forth *supra* — found to have constituted a prima-facie showing supportive of petitioners' bill for injunction; and which evidence on behalf of petitioners was subsequently supplemented by evidence introduced by them for the purpose of rebuttal of the evidence introduced on behalf of respondents.

The "Statement of Facts," set forth in the opening brief on behalf of the petitioners has been "accepted by the respondents as being substantially correct," so this court accepts the same accordingly. Therefrom and from an examination of the transcript of evidence, the exhibits in evidence, and the record, this court finds the facts to be as hereinafter set forth.

After World War II, Waianae Plantation, situated in the northerly part of the island of Oahu, ceased business. Its lands, comprising many acres, were sold to certain of the respondents herein, Hawaiian corporations, so closely interrelated that Capital Investment Company, Ltd., is deemed to be the parent corporation and the others to be its subsidiaries; also, privity has existed between them.

The property so acquired from Waianae Plantation included land along and embracing a small crescent-shaped cove of the ocean, in the shore line of Oahu, known as "Makaha Beach." Respondents subdivided that area and sold all but one of the lots of the subdivision for residential purposes, the one unsold lot, retained by respondents, is designated and known as lot "K-1-A."

Of the lots of the subdivision sold as beach lots, two, respectively designated as "195" and "196," of land court

application 1052, adjoining "K-1-A," of the same land-court application and subdivision, were bought by the petitioners, who acquired each and hold title thereto in fee simple, as tenants by the entirety; lot "196," an area of 16,464.00 square feet having been purchased in 1947 from Makaha Beach Company, Ltd., then a Hawaiian corporation, and "195," an area of 12,315.00 square feet, purchased in 1949 from the respondent Makaha Valley Farms, Ltd. Petitioners paid $4,900 for lot 196 and $3,500 for lot 195.

Makaha Beach Company, Ltd., was dissolved and no longer existed as a corporate entity at the time of the filing of the petitioners' bill for injunction, so, although named as such in the petitioners' bill, is not one of the respondents herein. In connection with, or prior to, the dissolution of Makaha Beach Company, Ltd., Makaha Valley Farms, Ltd., acquired all the unsold portion of Makaha Beach properties and subsequently sold same to Waianae Village Properties, Ltd., and at the time of the filing of petitioners' bill for injunction Waianae Village Properties, Ltd., was the owner of said lot K-1-A and Capital Investment Company, Ltd., was its agent in respect thereto.

Although, as noted *supra,* in its answer Makaha Valley Farms, Ltd., has denied that at any time mentioned in the petition it had any right of control over the property ("Lot K-1-A") referred to in the bill; denied the removal by it of any sand or other material, and also denied that it had any intention of removing sand or other material, from the premises ("Lot K-1-A") described in the petition; nevertheless, because it is so closely interrelated with the respondent Capital Investment Company, Ltd., — which latter has a stock interest therein, with the two corporations having the same person as president thereof — it has the status of a subsidiary of Capital Investment Company, Ltd.; also, because privity has existed between the former

Makaha Beach Company, Ltd., and Makaha Valley Farms, Ltd., and between the latter and its grantee, Waianae Village Properties, Ltd., present owner of said lot K-1-A; Makaha Valley Farms, Ltd., is properly a party respondent herein.

The petitioners' two lots ("195" and "196") and the lot ("K-1-A") owned by Waianae Village Properties, Ltd., are severally composed of sand; they are adjoining lots. Lot K-1-A of the Waianae Village Properties, Ltd., is unimproved and does not have any substantial structure or improvement thereon. It is contiguous to the petitioners' lot 196 on which at a cost of approximately $30,000 they have erected and occupy as their home a dwelling house which rests on pillars, or columns, which serve as the foundations, sunk into and resting upon sand. At times of rough seas, or stormy weather, when high waves break on the beach of the cove, the waves wash over or across the petitioners' said lots and said lot K-1-A. There then occurs, by wave action, a moving of the sand, resulting in an increase in width and depth of sand at certain places and a corresponding decrease of width and depth of sand at other places bordering on the same cove along which the aforesaid three lots are situated. Such occurrences are seasonal and are referred to in that locale and by laymen as a "shifting of the sand" and have been accounted for by expert witnesses as perhaps resulting from a changing of sand by wave action at times drawing sand seaward and at other times bringing in new sand from seaward. However, whether the wave action actually causes a shifting of the sand or withdrawal of sand and subsequent replacement with other sand, at one place or another and from time to time, it is a clearly established fact that there is a seasonal change in quantum of sand along Makaha Beach and of the lots bordering on the Makaha cove, so that at certain times the quantum at one end of the cove

is visibly increased and the quantum at the other end of the cove is proportionally decreased and vice versa, with corresponding but lesser changes occurring between the points most affected, the cove being the small bay or crescent-shaped indentation in the shore line between two prominent points of land projecting into the ocean.

The waves do move sand and when washing or flowing over an area composed of sand have a tendency to level the area over which they flow by washing away the higher to the lower parts and filling with sand any excavations or depressions before depositing sand elsewhere.

It is common knowledge — especially in the Territory of Hawaii with its many islands and their beaches — that when a hole is dug in the sand and that excavated is piled up, if waves lap or wash over both the thus made mound of sand and the hole the mound will be reduced or leveled and the hole filled. Also, a like result may occur when strong winds sweep over an area composed of dry sand.

Mr. Albert Edward Minvielle, Jr., a registered surveyor since 1929 and licensed structural engineer, testified that he knew the Klausmeyers' property at Makaha Beach and made a survey for them, in the course of which — on June 6 and 7, 1953 — he took elevations of the surface of the beach area between the shore and the bank and made what in engineering terminology is called a cross section, in 50-foot squares, which showed the sections in detail. He produced a sketch or plan prepared by him and which was introduced in evidence as petitioners' exhibit 24. He said that he was told that the court was interested in determining, or getting a determination as to, the amount of sand between the vegetation line and out toward the shore line. He worked on that assumption and computed the volume of sand from the shore line back to the vegetation line and from the surface of the sand down to the elevation of "decimal 8 feet" (eight-tenths of a foot) above mean sea

level and the quantum of sand thus computed was 82,450 cubic yards, more or less. His computation was not refuted and estimates given by other witnesses were admittedly merely guesses and unreliable and, therefore, the computation made by Mr. Minvielle is deemed to have furnished the most credible, accurate and reliable determination of the quantum of sand in the whole of the Makaha Beach area covered by his survey and included in his computations.

Theretofore, respondents had, from time to time, removed or authorized the removal of truckloads of sand from K-1-A and at the time of the filing of the petitioners' bill for injunction a great many truckloads, aggregating several thousands of cubic yards, of sand had been removed from said lot by respondents and it was apparent from heavy equipment moved upon the lot, being used and available for continued use, together with the loading and dispatching of many trucks, some of which were of great size, that many more thousands of cubic yards of sand would be removed by respondents, or with their authorization, from lot K-1-A, if operations with respect thereto were not restrained.

The witness Albert Edward Minvielle, Jr., in the course of his testimony, identified an area — marked in blue shading on said exhibit 24 — as being a depressed area within lot K-1-A and estimated that it would take 9,200 cubic yards (of sand) to fill it. This testimony was not refuted or rebutted and that the depression appeared to be a "man-made" excavation was testified to later by a witness (Von Holt) for respondents.

In the proceedings before the chancellor, as in their answers (*supra*), respondents claimed "a legal right to remove," at will and without limit, sand from within the boundary of the property owned by the respondent Waianae Village Properties, Ltd. (lot K-1-A). Respondents, by

their large-scale operations, continued despite protests made by Mr. Klausmeyer, of petitioners, indicated –– by actions speaking louder than words — an intention to exercise and continue to exercise what respondents claimed to be their legal right.

Further indicative of the respondents' attitude and intention was their allegation when before the chancellor, particularly at the time of obtaining a modification of the temporary restraining order issued at the time of the filing of the bill for injunction, that there existed an agreement, or contract, which required that 5,000 cubic yards of sand be delivered to the United States Navy. This court has not found any evidence whatsoever in the transcript of evidence, or the exhibits introduced in evidence, or anywhere in the record, any proof whatsoever, that such a contract, or agreement, in fact existed.

The testimony of the president of the respondent corporations — called as a witness by petitioners — was to the effect that respondents had no definite and accurate knowledge of the quantum of sand that was being or had been removed from lot K-1-A and relied upon one "Tommy Loo" (Thomas Loo) with whom "everything was done on mutual trust" to keep records of the quantities of sand being removed from lot K-1-A, there being an understanding with him, pursuant to which he, Loo, had removed the sand and for every load of same exchanged two loads of fill delivered at a project of the respondents.

When called as a witness, Thomas Loo admitted upon questioning that sand removal from lot K-1-A started as early as 5:00 or 5:30 in the morning and continued as late as approximately 9:00 or so at night. He said that he thought between 3,800 and 3,900 (cubic yards) of sand were removed, but did not know exactly; that records were kept daily by a clerk in his office, named Gilbert Ho, who got the records from the drivers; the drivers turned in their

tickets and were paid on an hourly basis, they being given three hours for a trip; they were Gilbert Ho's drivers, as he, Loo, had a contract with Gilbert Ho; the contract was to bring in the sand. Gilbert Ho's contract was for the hauling. It was verbal. Loo paid him two dollars a yard for the sand delivered. Sand from lot K-1-A was delivered at Middle street, and at Clarke-Halawa; had delivered to Clarke-Halawa about 2,000 and to Middle street approximately 1800 yards (cubic yards). Loo further testified that he did not take any of the sand from Makaha to deliver to the Navy, as he had sand from previous operations and it was that other that was delivered to the Navy. Subsequently, pursuant to request to do so, Loo produced what he identified as drivers' tickets turned in to Gilbert Ho for sand removal from K-1-A at Makaha during April, May, and June, of 1953; however, the last dated slip showed May 29. He said that he himself had totaled the slips and they showed 3,638 cubic yards of sand. He identified the Tommy Loo Transportation Company as his company. He said that he had no other records of sand removal.

Gilbert Ho, called as a witness, testified his arrangement with Loo was to haul sand by the yard at two dollars per yard. He used Tommy Loo's trucks, which he rented at $7.50 per day, 20-cubic yard trucks, the big trailers; and in addition used two six-cubic yard trucks, of other persons, who were doing the hauling for him at $1.75 per yard. He depended on Capital Investment Company to keep a record of the amount of sand removed, but that his drivers kept track of the loads, too.

Thus, it appears, *supra* — from the testimony of the president of the respondent corporations, that of Thomas ("Tommy") Loo and that of Gilbert Ho and the entirely unsubstantiated allegation of respondents of an obligation to furnish to the United States Navy 5,000 cubic yards of sand — there was such a careless and irresponsible removal of and dealing with sand from lot K-1-A as to warrant a

presumption by the petitioners and conclusion by this court that the respondents did not at any time either know, or have concern regarding, the quantum of sand removed, or which, with continuation of the operations, would be removed from lot K-1-A and so from the Makaha Beach area; also, that if not restrained by injunction the removal of sand would be unlimited.

David O. Klausmeyer, one of the petitioners, testified that he (for petitioners) bought lots 195 and 196 as beach lots and would not have bought them if they did not have sand on them; that he had observed the Makaha cove area since 1941, has lived in the Makaha area since December 15, 1949, and on lot 196 since the 3rd of May, 1952; that he had observed that as a general rule in the winter months the waves move sand up toward one end of the cove and it will remain there for several months until the spring of the (following) year, then, due to the different direction of the waves or possibly the current sand gradually "moves," or disappears, from that end and builds up at the other end of the cove; and that at times he had seen the waves of the ocean splash over and wash sand across the highway which runs along the landward side of the lots; when the court visited the property (Makaha Beach) the ocean was calm, but it sometimes gets rougher and when there is a good surf running the waves would be "between 20 to 30 feet high" on that beach, in the cove, in front of witness's lot and lot K-1-A; and when that happens the sand is inclined to "shift," depending on which direction the waves come from. He further testified that on April 8, 1953, he came home from work at approximately 4:00 o'clock and observed a mound of sand which a bulldozer had scooped up on lot K-1-A; the bulldozer was still there; about 5:30 a piece of engineering equipment known as a front-loader came down the highway and out on to the beach across the front of witness's property and over to lot

K-1-A. Immediately thereafter, several trucks came up and started loading sand and carted it away that evening; the next morning he had a talk with Chinn Ho (president of the respondent corporations) and told the latter there was very little, if any, sand in the ocean floor in front of the cove and that once the sand is removed it is gone. Upon Chinn Ho's inquiring if he knew that, witness told him that he, witness, had been spearfishing over almost that entire area, with goggles, diving down to the bottom and had noticed that there was very little sand there. It is almost entirely coral or lava rock. Chinn Ho then said, "Oh, well, we just need a little bit of sand."

Questioned about an occurrence in 1947, Mr. Klausmeyer said that one Sunday he took a trip from Waikiki out to Makaha to do some spearfishing and surfing and noticed that on lot K-1-A there was evidence of a large portion of the sand having been dug out and removed. He called up Francis Wong, who was one of the Capital Investment agents, and asked him why sand was being taken and received the reply, "Oh, our engineers are taking a small amount of sand to fix up some roads up the valley." Klausmeyer told him that he had bought the lot with the understanding it was going to be a private beach, and no sand was going to be taken out of there. Wong said he would have it stopped. It was apparently stopped for a week; however, the following week there was a tremendous excavation there, approximately a hundred yards long by about 20 yards wide, and 8 feet deep. Klausmeyer went directly to the Capital Investment Company and saw Mr. Chinn Ho and explained to the latter what was going on and the latter said, "Well, the engineers were taking sand out of there, but I did not know it was that much." At that time the Klausmeyers were the owners of lot 196. In 1950 removal of sand was resumed or again commenced and the operation continued for approximately a week or so, with

many trucks being used. A report was prepared by the U. S. Engineers at the request of the Outdoor Circle, with reference to sand removal at Makaha Beach. Several photographs were then introduced and marked respectively exhibits 5A, 5E, for identification. They were later admitted in evidence and marked accordingly. Referring to petitioners' exhibit 5 for identification, Klausmeyer said that that photograph was taken approximately April 15, 1953, and that the pile of sand therein shown is on K-1-A and was approximately 10 feet high and covered an area of about 100 square feet. Klausmeyer himself took the photograph. The photograph was introduced in evidence as petitioners' exhibit 5.

Samuel ("Sam") Harris, witness, testified that he worked for HC&D and that such firm was, at the time, engaged in a large development at Kahuku, Oahu, and removing beach sand from the Campbell Estate property.

He named as the large removal concerns in Hawaii: Grace Brothers, the HC&D, and perhaps Tommy Loo as the three largest.

He said the HC&D used its sand for its "Ready-Mix" concrete; also in making cement products, pipe, etc.

In the course of his employment he has become familiar with sand-removal operations, particularly at Kahuku, where he watches same very closely. Seasonally, at various seasons, they conduct their operations in one spot, and at other times of the year they cannot and have to move up and down the beach.

He is familiar with the cove out at Makaha, where the Klausmeyers live; also with the land where Chinn Ho has been removing sand, lot K-1-A.

His company can continue to remove sand from the same spot — at Kahuku — at certain times of the year, because the sand moves laterally, "the current brings it right down to us."

He knows that there is a current out there that brings the sand, because of the direction of the waves; the waves parallel the shore line, quartering. He knows about the waves and the current, because he spent about ten years on the sea.

He has personal knowledge of that side of the island toward Kaena Point; has fished five years off Waianae; sport fishing, also bottom fishing; is well known among fishermen; has his own boat, a cabin cruiser; has done trolling, still fishing, bottom fishing, where one anchors off shore; in the area of Waianae; is familiar with the currents down there and the directions of the current and with the cove where the Klausmeyers live and where Chinn Ho is removing sand.

There is plenty of sand in the cove, but it does not remain in the same position. He knows that from observation.

In explanation to the court as to what occurs in reference to the sand in the cove in the course of a year, he said that in the winter months when there is a northerly wind it causes the current to parallel the shore in a southerly direction, toward Waikiki. He lives at lot 186, Makaha Beach; has been familiar with that beach for about 18 months and has been fishing off Kaena Point for five years. Anchored in that particular bay (cove), many times bottom fishing; also outside same.

The sand of the cove at Makaha Beach is different from the sand found in other portions of the beaches of Oahu; it is coarser and harder and for that reason has particular value for sandblasting; fine sand cannot be used for sandblasting, because its specific gravity is too light and has no effect.

A few months ago had a good supply in front of his home on the Waikiki end of the cove, but very little now, nothing but coral.

With reference to lot K-1-A, has made a personal observation and seen what has occurred thereon with respect to the sand. By nature the sand is building up.

"Everyday I come home at night, and go out, I notice more rocks sticking out; more sand has disappeared. By the same token, I notice it down here, and there is more sand. In other words, your coast line is coming out and this one is going back."

HC&D has been taking sand from Kahuku for about 10 years and during that time has probably removed about 300,000 yards, per year; has estimated the amount of sand on the beach at Makaha and doubts there are over 100,000 yards there, on the whole beach.

Is familiar with the equipment that Loo was using on K-1-A and with same he could take 200 yards a day away. He has a bulldozer and a front-end loader, an International tractor with a scoop on the front; he has some large semi-dumps and trailer dumps. Believes that there was also a GMC diesel truck.

Norman F. Johnson, a witness, said that he was employed by the Pacific Pineapple Company and lives on lot 179, Makaha Beach, Waianae, on the cove in question. He lives on the Kaena Point side; has lived on Makaha Beach since September, 1950; and has been going out there off and on since 1937.

Prior to living there has done some fishing around there, some spearfishing; had some sampans during the war, 1942 and 1943; went fishing out there with them.

He has observed the sand out there. As of right now (time of testifying) has very little sand in front of his property; at times of the year has sand, approximately three or four months a year.

The quantity of sand on the beach varies during a year and when it disappears from one side of the cove it builds up at the other end. As the sand is taken away from the

Kaena Point side of the cove it usually accumulates on the Waikiki side.

In that cove, that is, at the shore thereof, waves sometimes get as high as from 20 to 30 feet; has seen them go over the peak of the beach and flow on to the level part of the beach, back into the vegetation.

Eudora Sylva, witness, testified that she lives at Makaha and bought her property from the Capital Investment Company, Ltd.; lives across the street or road on the mauka (landward) side of Harris'.

She is familiar with lot K-1-A and has seen sand being removed therefrom.

(Here, there was a stipulation by counsel that a bulldozer, a front loader, and trucks, both diesel and gasoline, were being used for removing sand from lot K-1-A.)

She has been familiar with the cove at Makaha since July, 1948, when she started living there permanently and has seen the sand at one place on the Waikiki side, and then on the Kaena side.

When she has seen sand on the Kaena side there was no sand on the Waikiki side and when there was no sand on the Kaena side has seen sand on the Waikiki side.

Sand is presently building up on lot K-1-A and is leaving the Waikiki side of the cove.

During rough weather the waves in the cove go as high as between 20 and 30 feet; has seen the waves come up on the Klausmeyer property, up to the pillars.

Roy Ohseik, for qualification as an expert, testified that he is a civil engineer, attended Washington University, St. Louis, Missouri, did not have a degree therefrom; has attended other professional schools; has done work in connection with beach processors. Worked in the Chicago office of the Army Engineers on a project studying beach conditions of the Illinois shore of Lake Michigan, and also for the Army Engineers in Hawaii, studying the beach-

erosion problems on the island of Kauai, also on the island of Oahu. Also attended schools for beach erosion, held by the Beach Erosion Board in Washington, D.C., attending there approximately 30 days.

Worked in connection with the compilation of Colonel Faulkner's report of October 10, 1950 (petitioners' exhibit "6" herein), pertinent to sand removal at Makaha.

In the course of his examination Mr. Ohseik testified as follows:

"It takes a long time to form beaches, except that if a beach in a cove were formed from sand which would move from an adjoining area into the beach, it might form rather rapidly. If it comes merely from, or is built from the reef off-shore, it is a slow process.

"I think it is a matter of quantitative analysis that you are concerned with. It is true that the ocean would bring back sand, but I don't know that it would bring it back in the period of time that you have in mind. It takes a long time for the ocean to form sand, to move it in. I think the concept that most people have is incorrect. The off-shore area of the ocean is not a sand bottom, but in this case, and in the case of most of the cases around Oahu, is reefed area. There is some sand in thin layers, may be several inches, in and between those little holes in the reef. But by and large the reef area is coral material, and the process by which wave action moves those broken particles of coral to the shore and grinds them up to form sand is a slow process.

"I would say the beaches in this area are comparatively shallow areas of sand, lying on coral and on lava.

"The only point at which the removal of sand would not affect the condition of the beach is that point where the uprush of high water can no longer reach the beach. When I say high water, I refer to the upsurge or uprush

of waves where it can no longer carry material into that point.

"I think the fact that waves have built up the berm at the Klausmeyer property to the level it is at present is an indication of the storms that have occurred in the past, and if storms of that magnitude occur in the future, it would be, — the waves would also attempt to rebuild the berm that high on lot K-1-A.

"During the summer at infrequent periods, large waves attack the shoreline, and the oceanographers have offered their explanation of that which is substantiated by examination of their character, that they are approaching from storms which have been generated in the equatorial and in the southern hemispheres. Those storms and waves coming from those storms, run up this beach, and because of their terrific energy contained cause a lot of damage and trouble along the southern and southwesterly shore of Oahu."

On cross examination, this witness (Ohseik) testified as follows:

"Any beach of a type where the beach moves up and down the cove area or bay area, I think if any sand, any amount of sand were removed, if they were physically united, as in the hypothetical case you stated, — if any sand would be removed it would have an effect on the adjoining property all the way up and down the beach, depending on the amount that was withdrawn but I could not state how much it would require to make any appreciable effect on the adjoining area."

Redirect examination. Mr. Parks (attorney for petitioners) framed a question and the chancellor reframed it as follows:

"If there is an injunction prohibiting the removal of sand from below high water mark, would that be any

protection to the adjoining property so far as beach erosion is concerned?"

Answer: "I do not believe that it would provide complete protection to the adjoining property owners because of the reason I mentioned here, the wave uprush would carry material above high water mark, as defined, — as has been previously defined."

Question: "Is there any doubt that where the sand leaves the Waikiki end of this cove, as it was during the present time, building up on this section of the cove here, which is the Kaena Point side of the cove, that the removal of that sand in sufficient quantity, depending, of course, on the type of machinery set up for it, can denude the entire beach area?"

Answer: "As I mentioned before, I don't think that we can say it would denude the entire beach, it would take probably the major portion of the beach sand."

Question: "Does that take a year or two years of study to get that?"

Answer: "I think not, for this reason that if we have so much sand in an area, and it is being produced, accreted in the area at a slow rate, and we take it at an excess rate, it is a logical conclusion it would take most of it away from the area."

Ben Nutter, superintendent of public works of the Territory of Hawaii, for qualification as an expert, testified that he was a graduate of Oregon State College as a civil engineer; also took some advance study at the University of California and has been practicing the profession of civil engineer since 1936.

In the course of his examination, as an expert witness, he further testified as follows:

His experience and background in work and studies in connection with the formation of beaches has been, most actively, since 1947, when there began to be a series of

erosional problems at Waikiki Beach. He supervised and directed the investigation and supervised the writing of the report. It involved, both for him and his staff, quite an extensive study on both the specific beach at Waikiki, and a study, generally, of beach processes, as they might apply to any normal beach or beach shore. It included a certain amount of research work, general investigation and special investigation that had been carried on by the University, by the Beach Erosion Board, by the Scripps Institute, then a study of the beach itself and the general problems that might apply to it.

With respect to Waikiki the project was concerned with two major phases; one, to prevent erosion, the other to provide protection, provide for beach protection and for recreational purposes.

On the Waikiki project, the first work started in 1947; the investigation carried through 1948, — active investigation. The economic studies and other things continued on through the end of 1951, and some discussions through at least into the middle of 1952.

He was formerly employed in the Honolulu office of the Corps of Engineers, from May, 1947, until June, 1952.

One specific project where erosional study was made was a study of two beaches on Kauai. The study on this island, Oahu, was on a beach which is called Pokai Bay at the town of Waianae, the study there having to do with the habits of the beach, and the effect of those habits on a breakwater which it was proposed to be constructed by the Territory.

Knows Roy Ohseik and that he also was employed by the Engineers.

Other than Mr. Ohseik, a Mr. Melaney, who was also an employee of the Corps of Engineers, and himself, Nutter, doesn't know anyone else in the Territory who has

as extended knowledge and extensive experience with beach-erosion projects.

He knows the Federal Beach Erosion Board and had a conference two weeks with such board.

There was an estimate made of the quantity of sand necessary to maintain the beach proposed to be placed at Waikiki, the estimate being 10,000 cubic yards per year. The estimate was made as an average over a 50-year period. The first year, of actual experience, was in excess of 10,000, the following time it had been at a rate less than 10,000 cubic yards per year. However, the entire beach has not been built yet, and it is a little difficult to say what that effect will be.

Has visited Makaha Beach twice. Is familiar with wave action or the direction of the currents in Pokai Bay.

"There is quite an extensive beach on the Kaena Point portion of Pokai Bay, which is a U. S. military reservation; it is a recreational beach; it is also used by them for training purposes, for amphibious landings. During certain sea conditions, the movement of the sand is caused, which pulls the beach, or by lateral movement, at or near the Honolulu end of the bay. After that storm condition is over, which may be a few days or a longer period, — you can't further tie it down, except it is a long period, then it returns to the Kaena Point end of the bay, and reforms the beach that seems to normally exist there."

Pokai Bay is situated on the island of Oahu adjacent to the town of Waianae and is in the vicinity of Makaha Beach.

Reference being made to Colonel Faulkner's report (petitioners' exhibit "6"), Ben Nutter said that he accompanied Colonel Faulkner on the field trip that was made in connection with the study, and participated in the conference with Colonel Faulkner, Mr. Melaney and Mr. Ohseik during the formulation of the report itself.

It had reference to the particular area involved in this case, the problem at the time being that sand was being removed, or had been removed from the mouths of streams, and from the adjacent areas near the mouths of the streams. Visited the area owned by the Klausmeyers and also lot K-1-A.

Ben Nutter, when asked what effect, if any, large scale removal of sand from one particular spot would have on adjoining areas if that sand removal takes place at points washed by the action of the waves, said, that during a succeeding period of calm weather almost no effect would be noticed, but that being followed by storm conditions the sand from the direction of the drift would be washed into that void to help fill it, but the downdrift portion or the portion down beach from the lateral drift would suffer from lack of nourishment, that is, lack of normal nourishment during the drift period; that is to say that during the continuous lateral movement, the beach in the direction of the travel of that drift would be said to be nourished by that lateral drift; it may cause an accretion, or it may not be sufficient to cause an accretion, but at least would be nourished by that drift of sand. If the drift is interrupted in any way by being caused to fill voids along the way, or by having put in the way a groin or other structure, that drift is stopped, and the nourishment is reduced or stopped by those devices.

Mr. Nutter further testified as quoted below:

"The sand shifts back and forth, the major movement of the sand from one end to the other, and sand is removed from a given spot, and the operation of removal is continued, the quantity that is drawn moving back and forward along the beach would be depleted in a number of years, depending on the rate of removal, and the rate of feeding to the beach from any outside source. If the rate of feeding to the beach is

slower than the rate of removal, it would be ultimately depleted. If the rate of feeding to the beach is more rapid than the removal, it would not be depleted."

Upon cross examination, Mr. Nutter further testified as *infra*.

"There are several kinds of beaches on Oahu. If we speak of practically the limitless length of beach, sand is lost through drift at the end of the portion that you are speaking of and it may gain at the same rate at the other end, so there is no change. It appears to be a static thing. However, beach is not really a static thing. It is the result of being added to or taken away. It may be a continuous process movement, as it is along a straight beach with no reversals. But the absolute opposite is true where it is in the bay head beach, it tends to oscillate back and forth, or move for long periods and stop to make short reversals.

"May I give an illustration? If I would send someone to buy an automobile, not knowing the price of an automobile, I would not send him out with ten cents. Does that illustrate my answer? The rate of supply is such that it is relatively small by comparison to the sudden removal, which I said was the assumption in the answer to the question, that it would not be comparable in magnitude. Does that clarify the answer?"

Asked whether the height of the beach berm has a direct relationship to the force and energy of a wave under normal conditions, Mr. Nutter replied:

"Less effect, less relationship to the normal wave height than it would have to the exceptionally high wave height. It would have a more direct relation to those waves which are higher or more severe waves, that is, an unusual condition which places sand high on the beach, rather than the day to day calm water conditions."

The respondents, for the purpose of introducing evidence to outweigh that (*supra*) by which the chancellor found the petitioners had established a prima-facie case, called several witnesses. The first, Doak Cox, employed by the Hawaiian Sugar Planters Association Experiment Station, as a geologist. His qualifications as a geologist were stipulated to by the attorney for petitioners.

Mr. Cox testified that one of his three major studies in geology at Harvard was physiography, a science which deals with the forms of land and the forces that tend to cause changes in them, including beaches and the processes that operate on them; that he has been engaged in geological work for twelve years, professionally, and sporadically, and not as a consequence of his major work, but because of interest, has had occasion to study beach processes on the island of Oahu, but has never undertaken the study of offshore areas particularly as regards sand supplies or sand deposits.

The testimony of Mr. Cox did not refute the testimony of petitioners' expert witnesses Roy Ohseik and Ben Nutter, but was supportive thereof, as shown by the below quoted questions put to him and his answers thereto upon cross examination.

Question: "Do you, deny that the commercial removal of sand can deplete a beach?"

Answer: "No. I don't deny that at all."

Question: "That is an obvious thing?"

Answer: "Yes."

Question: "That is an obvious deduction, it doesn't need expert testimony to know that?"

Answer: "No. Probably not."

Question: "Just the rate of removal in excess of the rate of manufacture would deplete it?"

Answer: "It would not even have to be in excess of the rate of manufacture, because there are other means

of removal which would be going on, natural removal."

Questioned whether it is basic of the tendency of waves to level off, fill in the depressed parts of the beach, Mr. Cox answered, "That's right."

\* \* \*

"\* \* \* I would say it was obvious that unlimited removal of sand would deplete a beach, yes. It wouldn't take unlimited removal."

Question: "Is it obvious that where sand builds up on a particular section of the beach, such as has been testified to in this case as occurring at K-1-A, that the unrestricted removal of sand from that lot in commercial quantities can deplete the sand material?"

Answer: "It could."

Question: "Are you able to say that it will not?"

Answer: "No."

Question: "If a hole is made by the commercial or artificial removal of sand on a beach, where the puka [hole] is dug out, is that area filled up at the expense of sand from adjoining areas?"

Answer: "Of the beach?"

Question: "Of the beach?"

Answer: "Partly."

Question: "There is no doubt, is there, Mr. Cox, that the unlimited removal of sand from a cove like this can denude any other cove of sand?"

Answer: "I should say there was completely no doubt whatsoever that the unlimited removal of sand from a cove like that would denude the beach completely."

Of the other witnesses for respondents, one testified generally as to his observation of beach areas of the island of Oahu during a period of many years and expressed opinions with respect thereto, but on cross examination testified that he had never made a study of beach condi-

tions, but only observed them from his point of view as a real-estate man. Also, that he had made no exact computation and all the information he had been giving was his "best guess."

Asked whether in his opinion removal of sand from one spot such as K-1-A would have any effect on the sand on either side of that lot, he said:

"Yes, I would say that the removal of sand if carried on beyond the wave limit would have an effect on surrounding areas."

Petitioners' exhibit 24 was shown to him and he was told that the low area between two streams was the shaded area and was asked whether that low area was created by streams or by man. To which he replied:

"The low area which is shaded here looked to me when I examined it to be created by man."

Question: "Do you know whether the removal of sand from one spot can denude the entire beach at a place like K-1-A?"

Answer: "Yes, I would say that if you took all the sand off of K-1-A, you would denude the surrounding areas. If you took it in moderation, I don't think you would."

Louis Price, another witness for respondents testified that he had been a resident of Honolulu for about eighteen years and is president of Pacific Concrete and Rock Company, also the owner of Price Concrete and Tank Company, and has been buying sand possibly for three years for the Price Concrete and Tank Company and buying or obtaining sand for the Pacific Concrete and Rock Company since June, 1950, prior to the incorporation of the company. He said that he had personal experience in taking out sand from Makaha Beach about three years prior to 1953, knows the location of the Klausmeyer property and he had excavated sand from a stream adjacent to the property;

took approximately 1,280 yards (cubic) from the area adjoining the Klausmeyer place and that was between September 14 and 20, 1950. Asked on cross examination whether he had stopped his sand removal at Makaha Beach voluntarily, his answer was:

"There was so much hell raised that we chose to stop."

James R. Holt, as witness for respondents, testified that he was born in Makaha and had lived there practically all his life; that in 1925 or in 1926 great quantites of sand, by carloads, were hauled away from where the Klausmeyers' house stands and he "thought" that since then the sand has been building up on the Klausmeyer property. However, the hereinafter quoted questions put to the witness and his responses thereto are significant.

Question: "Will you listen to my question and see if you can answer. At certain times of the year is there a large sand beach stretching from Edeburn's property down to the Klausmeyer property?"

Answer: "Yes."

Question: "Certain times of the year, does the sand all leave between the Edeburn's property and the Klausmeyer property and go over here to K-1-A?"

Answer: "Yes. I don't say it goes over there. I don't know where the sand goes."

As a preliminary to a view of the premises by the chancellor and the introduction of evidence on behalf of the petitioners, Mr. R. M. Towill, whose qualification as an expert surveyor was stipulated to by counsel for petitioners, was by the respondents initially called out of turn as a witness and testified to having established and marked the boundaries of the lots involved in the proceedings herein and in connection therewith to having determined — "by reference in using as a basis the U. S. geodetic bench mark bringing in the level and establishing a marker along

an elevation of .8 of 1 foot above mean sea level" — located the makai (seaward) boundary of the property being the aforesaid lot K-1-A. He had then also testified that at the average the elevation of the lot was approximately 9½ feet or 8.7 above average high-water mark.

At the conclusion of the examination of the witness James R. Holt, Mr. Towill was recalled as a witness for respondents and, counsel for petitioners admitting his qualification as an expert on engineering as well as surveying, he then testified to the taking of both colored and black and white aerial photographs of the section of land on Oahu known as Makaha Beach. Subsequently, aerial photographs identified by Mr. Towill were admitted in evidence as and marked, respectively, respondents' exhibits, "C," "D," and "E."

Asked whether he had occasion to identify the location of the high-water mark at lot K-1-A prior to April of 1953 — when he had identified it for the purpose of the proceeding herein — he said that he did and in response to a query, what were those occasions, if he could recall, he answered:

"Shortly after the Waianae Development Companies were organized, I had an occasion to survey the high water mark for subdivision purposes. That was sometime in 1946, and again, I believe, in 1947 I had an occasion to make a survey of the same high water mark in connection with subdivision work for the Waianae Property Companies."

He said further that it was Waianae property located at Makaha Beach and that such survey was made for one of the four respondent companies in this said proceeding.

Thereafter he was shown what purported to be a print of a map of lot K-1-A of land-court application 1052, situate in Makaha, Waianae, Oahu, T. H., and he identified it as one prepared by him. He said further that it was prepared from field notes taken pursuant to standard sur-

veying practices and showed the location of the high-water
mark on various dates, respectively, March 21, 1939,
November, 1946, April 15, 1947, and April 29, 1953, by a
broken line of a dash with three dots (repeated) for the
line of 1939; by a green line for 1946; by a yellow line for
1947 and by a red line for 1953. However, he said that the
location as of March 21, 1939, as indicated by the broken
line, was not pursuant to a survey made by him or under
his direction, but pursuant to information he obtained from
the land-court record as — to the best of his recollection,
if his memory served him correctly — located by James B.
Mann and checked by the territorial survey office. Such
map was admitted in evidence as respondents' exhibit "F,"
but with the understanding "that the lines as established
by the testimony of the witness will be used in evidence in
connection with that testimony that the line of 1939 will
be regarded by the Court — not as a line established by
first hand information of the witness, but that the witness
established that line from, as he said, the record that he
looked at pertaining to the matter."

The witness Towill, in response to an inquiry as to
whether he would have any idea where the high-water
mark was in between his surveys with reference to lot 196,
answered:

"No, sir. All I can testify is that on these dates, I
made surveys. That is where the high water mark is or
was."

The petitioners, for the purpose of rebuttal of the
evidence introduced by the respondents, introduced the
testimony of two witnesses not theretofore called, namely,
(Mrs.) Mildred Mack and (Mrs.) Pilani Johnson and also
recalled the petitioner David Klausmeyer for further
testimony by him.

Mrs. Mack testified that her husband is a physician and
surgeon; that they own lots 181 and 182 at Makaha Beach,

on the cove near the Klausmeyer property and that they bought their said lots from the Capital Investment Company in 1947. They have a home on the property and are living therein. They also have a swimming pool into which they pump salt water, for which purpose pipes go out 150 feet into the ocean. They are not able to pump salt water into the pool all the year around:

"Because the sand is in — we were not able to pump salt water from the end of November up until the first of May and last of April — it might have been the middle — I am not sure. I can check up on our water bill, because it makes a big difference."

When not able to pump salt water, fresh water is used.

At the time they purchased their lots there was a beautiful sloping beach, at least 150 feet, right down to the ocean, not a sign of coral in sight. Now — at the time of testifying (July 23, 1953) — have probably five or six feet in one spot and the sand is completely out.

The same thing occurred the previous summer.

Asked what she had observed with reference to the sand at K-1-A this year (1953) and whether she had noticed anything with reference to the level of the sand at the highway along K-1-A, Mrs. Mack replied as follows:

"Yes, you have to jump down now. There is a sort of a wall along the road there — in order to reach the sand. I can't swim there any more because it is difficult for me climbing up and down. And last summer, we swam there frequently when the beach was out in front of our place. We would go down there to swim and take the children down to swim, but the sand was level right up to the road, and we could get across easily, but I can't swim there now because of the jump down."

Mrs. Pilani Johnson testified that she has a home at Makaha Beach; that she recalled when the bulldozer first came to lot K-1-A about April of the year (1953) and saw

it operating when it first arrived there. She was told that the testimony of Thomas Loo in the case was that a bulldozer went into the water to get washed off and she asked to tell what she saw. She replied:

"Well, I heard the noise of the bull dozer; so I walked outside and looked down the beach, and I saw the bull dozer in the water and it was pushing up. It was pushing sand up and I thought at the time that they were opening up that stream there to let out all of that stagnant water in the stream on the beach, and at the time that was what I thought the bull dozer was doing."

Asked whether the bulldozer did that just one time, she replied:

"No, they kept on there as long as I was out there. I was out there for 15 or 20 minutes."

She said that she also saw trucks hauling sand away.

She said that she had been familiar with Makaha Beach for three years — ever since she moved out there — her property is at the extreme Honolulu or Waikiki side of the cove. At the time her home was built, there was between a 150 and 200 feet of sand in front of her place, but now (July, 1953) has just bare coral and the reef.

Asked by the chancellor during what periods there was sand in front of her place, she said:

"It comes in in November and it is in about April or May, and then starts going out."

She further said that if the sand is out in front of her property, it starts to fill up, at the cove, at the other end of lot K-1-A.

Mr. Klausmeyer, testifying upon being recalled, identified two photographs, respectively thereafter admitted in evidence as petitioners' exhibit 27 and petitioners' exhibit 28, the former as having been taken in the spring of 1947 and the latter about "1944 or 1945 during the war years."

They severally purport to show portions of the Makaha Beach area herein referred to as lot K-1-A, looking toward the mountains from the ocean side, showing the beach to be apparently level, or sloping gently.

Upon cross examination, Mr. Klausmeyer indicated that he did not know or understand the fixing of high-water mark as done by the surveyor, Mr. Towill, at .8 of a foot and said that from his observation of the day the court met (at Makaha Beach), "the high water mark was in the middle of the wave wash — I mean the normal wave wash," and that shore line in 1947 was nowhere near this when he purchased his property. "It was quite a distance in front where the shore line and water actually was."

The removal of sand from lot K-1-A by the respondent Capital Investment Company, Ltd., as agent for the respondent Waianae Village Properties, Ltd., or by others with the authorization of said respondents, has been both admitted and by the evidence established as a fact. The quantum of sand so removed and prospectively to be removed has not been factually established with exactness. However, the transcript of testimony and the exhibits in evidence furnish proof — quite convincing to this court — that the quantity removed, that being piled up and thus made ready for removal and which, by admissions, contentions, and activities of said respondents the latter have claimed a right and have demonstrated an intention to remove, or authorize to have removed, would, cumulatively and in the aggregate, amount to a minimum of several thousand cubic yards and would prospectively be unlimited, if not restrained by judicial action. Removal of sand accordingly from lot K-1-A would be likely to cause such a depletion of the sand of the Makaha Beach area that when seasonally, or in times of rough seas and high waves, the waves of the sea wash across lot 196 and lot K-1-A and in normal course carry sand with or in them,

an abnormal amount of sand would then be deposited in excavations in lot K-1-A and the petitioners' lot 196 would be deprived of a proportionate amount and in time would be depleted of sand accordingly and thus by loss of natural and heretofore existing support the petitioners' dwelling house would be endangered, impaired, made uninhabitable, or be lost entirely, and thus irreparable damage result to petitioners. The cause and effect would be attributable to the said respondents, as there has been proof that in the normal course of events and without man-made depletion of the sand of lot K-1-A the action of the waves during periods of rough seas and high waves have either not injuriously eroded petitioners' lot 196, or have had a tendency to deposit sand thereat, with resultant accretion thereto.

The gist and pith of the contention of the respondents is contained in the three paragraphs extracted and quoted *infra,* from the answering brief filed herein on their behalf.

"Inasmuch as the petition did not allege any present damage, the answer of the respondents placed in issue only one question : whether the petitioners would suffer irreparable damage by any sand removal contemplated by the respondents.

"The answer admitted the sand was being removed. Consequently, the manner in which the sand was being removed, the use which was being made of the sand after its removal, and, except as it related to the question of irreparable damage to petitioners, the quantity of sand removed had no bearing on the case.

"The sole question of fact and of law before the court resolved to this : 'Would the removal of sand as undertaken by respondents be the cause of any irreparable damage to the petitioners?' "

In argument on behalf of the respondents, emphasis has been given to the phrase "sand removal contemplated by the respondents," and that the quantum of sand they

"contemplated" removing would not be so great as to have any appreciable effect on the petitioners' lot 196, or as to cause the petitioners to suffer irreparable damage.

Used in the sense in which it has been, to "contemplate" is to purpose or intend. It includes "intent," which has been held to be an act or emotion of the mind seldom, if ever, capable of direct or positive proof, but one which may be inferred from visible conduct and open acts.

In the instant case the visible conduct and open acts consisted of the moving onto lot K-1-A of the heavy equipment, such as a bulldozer and loading machine, and the use thereof, together with many trucks, several of which were of great capacity, in connection with the removal of many thousands of cubic yards of sand from lot K-1-A and an apparent readiness to continue such operations without limitation, with the claim of right to do so and heedless of a protest by the petitioner David O. Klausmeyer. Whether the acts mentioned were by the respondent Waianae Village Properties, Ltd., or by Capital Investment Company, Ltd., as its agent, or pursuant to authorization given by them, or either of them, such operations were nevertheless attributable to them and they were responsible therefor.

Viewing the situation as it existed at the time of the filing of the petitioners' bill for injunction and the attitude of the said respondents as reflected in their answers and in the evidence which was introduced in the proceedings before the chancellor, as disclosed by the record, this court has not been favorably impressed by representations made by them, or on their behalf, in arguments before this court wherein or whereby a position contra to their's before the chancellor has been assumed herein.

"While it has been said that the writ of injunction will not be awarded in new and doubtful cases not coming within the well established principles of equity,

yet the absence of precedent, although not to be over-looked entirely, does not of itself determine questions of jurisdiction. It is not a fatal objection that the use of the writ for the particular purpose for which it is sought is novel. Courts may amplify remedies and apply rules and general principles for the advancement of substantial justice. If this were not so, and courts were confined to particular precedents, there would be no power to grant relief in new cases constantly occurring." (43 C. J. S., *Injunctions,* § 18, p. 429.)

The instant case may be a novel one in Hawaii, but there is other than local precedent for it. The leading precedent is the English case — cited both by the petitioners and by the respondents — of *Attorney-General* v. *Tomline,* 14 Ch. Div. 58 (1880), wherein, pursuant to an action by the owner of a piece of land adjoining a foreshore, an injunction was granted to restrain the defendant, the owner of the foreshore, from removing shingle therefrom, so as to expose the plaintiff's land to the inroads of the sea; "although the shingle was removed for sale in a natural and ordinary user of the land."

At the trial thereof, Mr. Justice Fry granted an injunction restraining the defendant from so digging or removing, or authorizing to be dug or removed, any shingle from the natural barrier of shingle as to endanger the plaintiff's land, and to expose it to the inroads of the sea. From that judgment the defandant appealed.

On behalf of the appellant it was contended:

"The Plaintiff's evidence is insufficient to shew any present injury or any danger of future injury to the land. The Defendant claims to exercise his right to the foreshore in a natural and legitimate way. The taking away of the shingle from time to time and selling it for profit is a legitimate use of it. If his neighbour is injured by his doing so, there is no right of action."

That contention was not sustained on the appeal. The decision on appeal was contra thereto.

James, L. J., said (p. 60) :

"I am of the opinion that the judgment of the learned Judge ought to be affirmed.

"Upon the question of fact the learned Judge arrived at the conclusion, as warranted by the evidence, that the bank in question had been substantially interfered with by the acts of the Defendant, and that those acts had resulted in an appreciable injury to a particular part of the land, and he was further of opinion (as it appears to us rightly) that the Defendant was claiming as of right to continue to do that which he had done, notwithstanding the consequences of the act upon the adjoining lands of the Plaintiff. *For this purpose it need not be considered whether it is.the land of the Crown or anybody else's land.* (Emphasis added.) That is not material. He was of opinion, therefore, that sufficient facts had been established in evidence to prove an intention on the part of the Defendant to do that which would continue the injury and which would conduce to damage and injury to the owner of the adjoining land, and that therefore it was a fit case for the interference of the Court by way of injunction to restrain him from doing that which would be a nuisance to his neighbours (for that is the extent of the injunction), if he were minded so to do, and that therefore there was a proper case established in point of fact and in point of claim on the part of the Plaintiff to warrant the Court determining, as between the Plaintiff and the Defendant, the question of right."

Brett, L. J., said (p. 64) :

"I also think that the judgment ought to be affirmed, and for the reasons given by the learned Judge.

"I confess I think that he has, with great care and

with remarkable skill, brought out the only principle upon which the judgment can properly be founded. I think it is a difficult case, and I think that the rule which he has enunciated and which he has applied has not, so far as I know, been before this laid down or applied by any Court."

Then, after a statement finding the facts to be substantially as set forth by James, L. J., Brett, L. J. continued, at the bottom of page 65, as follows:

"Therefore it comes to a nice point. There is no dominant right of the Plaintiff over the land of the Defendant. There is no obligation on the Defendant to keep the sea out, and therefore the question comes to this, whether one can find any principle upon which, although he is not bound to keep the sea out, yet he must not do an act which will let the sea in. I think there is such a principle, and that it is the principle which has been enunciated by the learned Judge, and the principle upon which he has acted."

Cotton, L. J., said (p. 67, *et seq.*) :

"I am of the same opinion.

"The case which is before us is this: The Plaintiff, a landowner, seeks relief against the Defendant on the ground that the Defendant is so dealing with his own land as to damage the land of the Plaintiff. Now the *Plaintiff happens to be an officer of the Crown in whom the land in question is vested for certain public purpose, but that, in my opinion, is immaterial. The question must be dealt with just as if there were a subject as Plaintiff complaining of a subject as Defendant.* (Emphasis added.)

\* \* \*

"Then the question which we have to consider is this, whether or no that prospective or apprehended injury to the land of the Plaintiff is one which, if done,

would be actionable, and one which the Court ought to restrain by injunction. I am of opinion that it is. What the Defendant says is this, 'I am only dealing in the natural way with my land, and I have a right to deal with it in the natural way, that is to say, in the only way in which profit can be made out of it.'

"I will not enter minutely into the question — which is a difficult one — as to what is the natural use of land. The natural use of minerals is held to be the digging them out and making them merchantable, and possibly and probably the natural use of the shingle is to take it for the purposes for which it has been taken and selling it.

"But does that justify the Defendant in doing by that means an injury to his neighbour? The right of one to use his land for natural purposes, though some loss does accrue to his neighbour, is an exception to the general rule; but, in my opinion, that cannot apply where the land with which the Defendant is so dealing is, before it comes into his hands, subject to an obligation, which is being interfered with by the act which he does. In that case, whether it is the natural use of the land or not in the sense in which that word has been used, if he is breaking an obligation or duty attaching to the land, in my opinion his neighbour, if he is injured, has a right of action; if his neighbour apprehends an injury, and can satisfy the Court that that injury will come if the acts are continued, he has a right to an injunction."

Another precedent is the case of *Murray* v. *Pannaci et al.* (Court of Chancery of New Jersey. Nov. 11, 1902) 53 Atl. 595.

"2." of the syllabus is as follows:

"2. Where it appears that the excavation of sand from a portion of the seashore by the owner thereof will,

by the law of gravitation, and by wave motion, result in the removal of adjoining soil of another, and that such latter removal will expose the land of a third party to the action of the waves, the third party is entitled to injunction restraining the excavation."

This was a bill filed by Mrs. Murray, the complainant, to have the defendant, Mrs. Pannaci, restrained from excavating and carting away sand from the seashore in front of the properties of the complainant and defendant. The parties owned adjoining land bordering on the Atlantic Ocean, at Seabright. The lot of the complainant was protected by a bulkhead situated some distance inland from ordinary high-water mark. The ordinary high-water mark was from 46 to 56 feet easterly from the bulkhead. The property of the defendant was not so protected. Upon the defendant's property was a row of bathhouses beginning outside the line of ordinary high-water mark and running back 80 to 90 feet. The evidence disclosed that Mrs. Pannaci had caused sand to be taken, not only from the beach in front of Mrs. Murray's, but large quantities had been removed from the shore in front of her own property and sold for filling purposes elsewhere. The claim of the complaint was that the removal of the sand had lowered the beach in front of her property, and destroyed the protection which its presence gave to her upland. The defendant, while admitting that sand was taken from the shore in front of Mrs. Murray's property, disclaimed any right to do so, and any intention in the future to do so. The contest was confined to the right of the defendant to excavate and remove sand upon the shore in front of her own property. It was remarked that the defendant held a riparian grant from the State for the shore in front of her property. The complainant had no such grant.

The defense rested upon three grounds:

(1) That the defendant was using the property for natural and reasonable purposes;

(2) That the removal of such sand worked no injury to the complainant, because the sand was almost immediately replenished by the action of the waves; and

(3) That if any injury resulted to the complainant it was *damnum absque injuria.*

Reed, V. C., in his decision in this case cited the case of *Attorney-General* v. *Tomline,* 12 Ch. Div. 214, and posed the question whether the doctrine thereof was applicable in the State of New Jersey. He said, *inter alia:*

"The supreme court of Massachusetts has, upon more satisfactory grounds, laid down the rule that a person who excavates on his land in such a manner as to let in the sea, which undermines and injures the adjoining land of another, is liable for the injury so placed. This result was reached upon the reasoning of Chief Justice Shaw in his opinion in *Com.* v. *Alger,* 7 Cush. 53-86. In that case the defendant, having title to low-water mark, violated a statute which limited the lines to which a wharf could be extended. The question was whether this statute was an infringement of the vested rights of the owner of the shore. In his opinion in that case Chief Justice Shaw said: 'All real estate, inland or on the seashore, derived immediately or remotely from the government of the state, is taken and held under the tacit understanding that the owner shall so deal with it as not to cause injury to others; that when land is so situated, or such is its conformation, that it forms a natural barrier to rivers or tidal water courses, the owner cannot justifiably remove it to such an extent as to permit the waters to desert their natural channels, and overflow and perhaps inundate fields and villages, render rivers and harbors shallow, and consequently desolate and thereby destroy the valuable

rights of other properties, both in the navigation of the stream and in the contiguous lands.'

" 'Ordinarily, and when no such circumstances exist, the owner of the land has a perfect right to use and remove the earth, gravel, or clay of which the soil is composed, as his own interest or convenience may require. But can he do this when the same materials form the natural enbankment of the water course? He may say, perhaps, that he merely intends to make use of materials which are his own, and to which he has the right, and for which he has other uses. But we think the law will admit of no such excuse. He knows that when those materials are away the water, by law of gravitation, will rush out, and all the mischievous consequences of diverting a water course will follow.' "
Resuming, Reed, V. C., said:

"In the case of *Mears* v. *Dole,* 135 Mass. 508, the plaintiff and defendant owned lands adjoining by the sea, the land of the defendant being bounded easterly and northeasterly, and in part northwesterly, by the land of the plaintiff. Part of the complainant's land extended between the defendant's land and the sea. The defendant excavated and carried away for sale the soil and gravel from his land down to low-water mark for a considerable distance inland, and near the line of the plaintiff's land, but not so near (except for the action of the sea) that his land would have been undermined and would have fallen in. The consequence of the excavation was that through the action of the sea the plaintiff's land was undermined and washed into the excavation of the defendant. The court said, after citing the language of Chief Justice Shaw, already displayed: 'The defendant by his excavations on his own properties brought the sea upon his land, where it would not have been but for the excavations; and as a consequence it

has escaped and acted upon the plaintiff's land so as to cause damage, and for this he must be held responsible.' The principle thus enunciated is, in my judgment, sound. It is applicable to the present case, where the sand has been removed in such quantities as to produce a substantial injury, and no precautions were taken to prevent the resulting damage. If the property from which the sand was taken had adjoined the land of the complainant, the application of the doctrine to the facts of this case would be at once manifest.

"* * * Adjacency is not the ground upon which protection to property for such acts rests. The rule to be applied is analogous to that underlying the doctrine of lateral support. The liability of an excavator is not limited to the injury done to the adjacent owner, but includes any injury to any owner of land within the zone of support. Corporation of Birmingham v. Allen, 6 Ch. Div. 284; Keating v. City of Cincinnati, 38 Ohio St. 141, 43 Am. Rep. 421; Gilmore v. Driscol, 122 Mass. 199, 23 Am. Rep. 312.

"In the present case, if it be conceded that the owner who brings the ocean upon his land is responsible for its effects upon other land, it must follow that the responsibility includes any land an injury to which is the proximate result and reasonable sequence of such conduct. To put the proposition in a shape better fitting the facts of this case: If the excavation of the soil by the defendant was so great that by the law of gravitation or of wave motion it resulted in the removal of the adjoining soil, and the removal of this soil exposed the property of a third party to the erosive action of the ocean, then, if the last result was the reasonable and proximate sequence of the original act, the excavator is liable for the ultimate event."

Other cases are referred to *infra*.

*Mears* v. *Dole,* 135 Mass. 508 (1883).

This is referred to and sufficiently covered in the reference made thereto in *Murray* v. *Pannaci, supra;* and, likewise, *Commonwealth* v. *Alger,* 7 Cush. 53 (61 Mass.)

*Cleland* v. *Berberick,* 8 British Ruling Cases 949; 30 Ont. L. R. 636 (March 21, 1916).

This case held that one, who by removing sand from the portion of the beach owned by him, has facilitated the washing away of a large portion of the beach of an adjoining owner, is liable for the resulting depreciation in value of the premises.

In this case the parties owned adjoining lots on the shore of Lake Ontario, that of the appellant lying to the south of the respondent's lot.

The respondent's complaint is that, in consequence of the appellant having removed the sand from his own lot, the sand which formed a smooth, sloping beach on the respondent's lot had been carried away from it and into the excavation which was made in the appellant's lot by the removal of the sand, with the result that the respondent's beach had been destroyed and his land much depreciated in value.

The trial judge found that the complaint was well founded, determined that what the appellant had done was an actionable wrong and directed that judgment should be entered for the respondent (appellee) for a specified sum.

The judgment of the appellate court was delivered by Meredith, C. J. O., and the following is quoted therefrom:

"The learned trial judge was of opinion that *what the appellant had done was an interference with the right which the respondent had to the lateral support of his lot by the appellant's land, and that it was none the less a wrongful interference with that right because the carrying away of the sand from the respondent's beach was not caused solely by the removal by the appel-*

*lant of the sand from his lot, but by that act combined with the action of the wind and waves* upon the sandy beach. (Emphasis added.)

"What amounts to a wrongful interference with a landowner's right to the lateral support of his neighbor's land must necessarily vary according to the nature of the soil.

\* \* \*

"The observation of the Master of the Rolls that 'there might be other land so friable and of such an unsolid character that you would want a quarter of a mile of it,' is, I think, directly applicable to soil such as that of which the beach was composed. It is manifest from the nature of it that an excavation in his neighbor's lot was likely to take away from the respondent's lot the natural support which it had from the soil of the appellant's lot; and that, while the excavation which the appellant made could not have affected injuriously the support which his lot afforded to the respondent's lot, if the soil of both had been clay or any other solid substance, it did, owing to the friable and shifting nature of the sand of which the beach was formed, materially and injuriously affect it.

"I can see no difference in principle between the application of the law as to lateral support as it was applied in the cases \* \* \* and the application of it on the facts to the case at bar.

\* \* \*

"Upon the whole, I am of opinion that the judgment is right and should be affirmed, and the appeal be dismissed, with costs."

*Fletcher* v. *Rylands*, L. R. 1 Ex. Cases 265, is a case wherein the appellate court, reversing the judgment of the Court of Exchequer, held the defendants were liable for damage caused by defendants. The factual basis for the

holding appears in the headnote to the case which is quoted *infra*.

"The defendants constructed a reservoir on land separated from the plaintiff's colliery by intervening land; mines under the site of the reservoir, and under part of the intervening land, had been formerly worked, and the plaintiff had, by workings lawfully made in his own colliery and in the intervening land, opened an underground communication between his own colliery and the old workings under the reservoir. It was not known to the defendants, nor to any person employed by them in the construction of the reservoir, that such communication existed, or that there were any old workings under the site of the reservoir, and the defendants were not personally guilty of any negligence; but, in fact, the reservoir was constructed over five old shafts, leading down to the workings. On the reservoir being filled, the water burst down these shafts, and flowed by the underground communication into the plaintiff's mines * * *."

In the answering brief on behalf of the respondents herein, the case of *Ainsworth* v. *Lakin,* 180 Mass. 397, has been cited as a limitation of the doctrine (of *Fletcher* v. *Rylands*) and this is quoted therefrom:

"This rule is rightly applicable only to such *unusual* and *extraordinary* uses of property in reference to the benefits to be derived from the use and the dangers or losses to which others are exposed, as should not be permitted, except at the sole risk of the owner. The standard of duty established by the courts in these cases is that every owner shall refrain from these *unwarrantable* and *extremely dangerous* uses of property unless he provides safeguards whose perfection he guarantees." (Emphasis added in the brief.)

But, respondents failed to quote a modifying additional sentence, to wit:

"That there are uses of property not forbidden by law to which this doctrine properly may be applied is almost universally acknowledged."

Respondents have also cited *Carpenter* v. *City of Santa Monica*, 147 P. (2d) 964; *Cunningham* v. *Prevow*, 192 S. W. (2d) 338; *Curtis* v. *Upton*, 175 Cal. 323; *Gas Products Co.* v. *Rankin, Attorney General*, 63 Mont. 372; *Kaufman* v. *Boston Dye House Inc.*, 280 Mass. 161; but, this court, after examination of the reports of such cases, deems them inapplicable, by analogy or otherwise, to the instant case.

In another case cited by respondents, *Ludlow* v. *The Hudson River Railroad Company*, 6 Lans. 128 (N. Y. Sup. Ct.; March 1872), the court held that the action was not barred by the statute of limitations, because the injury complained of did not accrue until April, 1864, and the action was commenced in March, 1866.

"* * * The damages did not exist, and had not been incurred when the work was done, or within six years thereafter. If an action had been brought before they had actually been sustained, the amount of recovery would have depended upon mere probabilities and the wildest conjecture. The consequential injury had not happened until the land of the plaintiff slided away, and hence no action could be maintained for the damages arising in consequence thereof."

The above quotation is taken directly from 6 Lans. 128 at 133 (N. Y. Sup. Ct.). The paragraph was incorrectly quoted in the answering brief of respondents, at page 30 thereof.

Incidentally, in the *Ludlow* case (*supra*) the appellate court said, *inter alia:*

"* * * The maxim *'Sic utere tuo et alienum non laedas'* ['so use your own that you do not injure that of

another'] is as old as the common law itself, and the defendant had no right to remove the natural support of the soil so as to injure the land of the plaintiff, by virtue of the conveyance of the plaintiff, and was clearly liable for the damages which followed as a consequence of the act."

The *Ludlow* case (*supra*) was a civil action for damages allegedly sustained, whereas the instant case is an action in equity, for an injunction to restrain action and thus prevent the continuance of same and avoid what would be the probable consequence thereof and resultant damage therefrom, if continued without limitation. Therein lies the difference between the two cases. It is illustrative, or an example, of the limitations, of jurisdiction and power, of a court of law, as compared to the jurisdiction and broader powers of a court of equity (or chancellor in equity) theretofore existing and existing at the time of the trial of the instant case.

Pertinent and supported by the cases cited in the notes thereto is this summarization in 28 Am. Jur., *Injunctions,* § 30, p. 223 — *Anticipated or Threatened Injury* —

"While injunction will not, as a rule, issue upon mere fear, apprehension, or possibility of injury, this does not mean that the remedy may not be granted to prevent future wrong although no right has yet been violated. The main virtue of injunction is to anticipate and prevent threatened wrongs which, if committed, a court of law could not adequately remedy. In fact, a remedy which prevents a threatened wrong is better than one which provides for the payment of damages caused thereby. Thus, where the danger is probable and threatened, the party may invoke the aid of equity to prevent it and need not delay his application for injunction until the injury has actually been inflicted. If the injury is certainly impending, certainly to be

expected, that is enough, even though nothing has been done by the defendant for which an action at law could have been brought. In considering the propriety of an injunction, damage threatened, which is irremediable by action at law, is equivalent to damage done. In this regard, it may be noted that courts will enjoin a threatened or anticipated nuisance, public or private, where it clearly appears that a nuisance will necessarily result from the contemplated act or thing which it is sought to enjoin. A temporary injunction may be issued upon a showing of a threatened injury, if the apprehended injury is a real and not an imaginary one, and will cause injury or damage of irreparable character. If a threatened wrong consists of a single act, which will be temporary in effect, the complainant may well be left to his remedy at law, but if persistent repetition of the wrong is threatened, equity will move to afford in a single action its more adequate remedy by injunction."

See also 28 Am. Jur., *Injunctions,* § 31, as to *Controlling Exercise of Lawful Rights;* § 35, as to *Discretion of Court;* and § 36, on the *Nature and Extent of Discretion.* The quotation next *infra* is from § 36.

"While the court in the exercise of its discretion in respect of the grant or denial of injunctive relief is not controlled by technical legal rules, the power is not a mere arbitrary and unlimited one, nor does it constitute the mere whimsical will of the court, but is the exercise of a sound judicial discretion, reviewable on appeal, the court being informed and guided by the established principles, rules, and practice of equity jurisprudence. It does not include a misapplication of the law to the conceded facts, nor is it broad enough to permit the court to refuse to protect either private or public property or rights, because the invasion of such

property or the violation of such right would be of benefit to an individual or to a portion of the public. The grace which the court may thus exercise sometimes becomes a matter of right to a litigant, and when it is clear that the law cannot give protection and relief, to which the complainant in equity is admittedly entitled, the court can no more withhold its grace than the law can deny protection and relief, if able to give them. In the exercise of this discretion, the court may consider the comparative inconvenience or damage and the injury or detriment to the rights of the public and third persons that would result from awarding the injunction."

"* * * The very function of an injunction is to furnish preventive relief against irreparable mischief or injury, and the remedy will not be awarded where it appears to the satisfaction of the court that the injury complained of is not of such character. * * * The mere assertion that apprehended acts will inflict irreparable injury is not enough. The complaining party must allege and prove facts from which the court can reasonably infer that such would be the result." (28 Am. Jur., *Injunction*, § 47.)

"It is somewhat difficult to frame a general definition of irreparable injury that would be applicable to all the cases. The term has acquired in the law of injunctions a meaning which, perhaps, is not quite in keeping with its derivation or its literal signification, and has been often defined by the courts in varying language. The question whether the complainant will in fact suffer an irreparable injury in the sense here intended must depend for its solution largely upon the character of the act or acts alleged to be injurious. * * * As ordinarily understood, an injury is irreparable, within the law of injunctions, where it is of such a

character that a fair and reasonable redress may not be had in a court of law, so that to refuse the injunction would be a denial of justice; where, in other words, from the nature of the act, or from the circumstances surrounding the person injured, or from the financial condition of the person committing it, it cannot be readily, adequately, and completely compensated for with money. * * * The term 'irreparable damage' does not have reference to the amount of damage caused, but rather to the difficulty of measuring the amount of damages inflicted. * * *"

"An injury will be regarded as irreparable so as to warrant injunctive relief where it tends toward the destruction of the complainant's estate, or where it is of such a character as to work the destruction of the property as it has been held and enjoyed, so that no judgment at law can restore it to him in that character. * * *" (28 Am. Jur., *Injunctions,* § 48.)

An element in the instant case is the fact that the Makaha Beach area was subdivided and the lots of the subdivision sold by the respondents and purchased from them for residential use, which would, of course, be in expectation that dwelling houses would be built thereon. A reasonable presumption is that, as to such lots as were sold and purchased as beach lots — and as to the petitioners' lots 195 and 196 there is more than a presumption, the uncontradicted testimony of Mr. Klausmeyer — a persuasive factor to the buyers and an inducement for the purchase by them of the lots was the existence of the cresent-shaped cove and the white-sand beach on parts of the shore thereof, to which some lots adjoined and others were adjacent.

The respondents classified, represented, offered for sale and sold certain lots of the said subdivision as "beach lots," for which they asked and were paid enhanced or

premium prices. Petitioners purchased lot 196 as a "beach lot" on May 8, 1947. Subsequently, in the same year, respondents removed sand from their retained lot K-1-A. What occurred thereafter appears from the uncontradicted testimony of petitioner David Klausmeyer, as quoted *infra,* from pages 88 and 89 of the transcript of evidence herein.

"Q What occurred in 1947, Mr. Klausmeyer?

"A One Sunday I took a trip from Waikiki out to there, to do some spear fishing and surfing, and I noticed that on lot K-1-A there was large portion of the sand that had been dug out and removed, and I was very disturbed about this.

"Q What did you do, if anything?

"A Well, the first thing, the next morning, I called up Francis Wong, who was one of the Capital Investment agents, and I asked him why he was taking sand, why it was being taken, and he said, 'Oh, our engineers are taking a small amount of sand to fix up some roads up the valley.' I said, 'Well, I bought the lot with the understanding it was going to be a private beach, and no sand was going to be taken out of there. And he said, 'Well,' he said, 'is there very much gone?' And I said, 'There is quite a bit.' He said, 'Well, I will have it stopped,' and I thanked him. Next week I called and the said removal had evidently been stopped, because the excavation was no larger that I could notice. However, the following week I went out and there was a tremendous excavation there, approximately a hundred yards long by about twenty yards wide, and eight feet deep. This time I got really disturbed and I went directly to the Capital Investment Company and saw Mr. Chinn Ho, and I explained to him what was going on, and he said, 'Well, the engineers were taking sand out of there, but I did not know it was that much.' So, he called somebody, I don't know, — I didn't know who

they were then, and he said that the property owners were complaining about the removal of sand, and to stop. Evidently it did, because the next week I went out and there was no further sand removed."

In reliance upon the respondents' conduct in ceasing sand removal operations after such had been objected to and their offer of sale of the lot at an enhanced or premium price as a "beach lot," petitioners purchased lot 195 on March 29, 1948.

Knowing, as they must have, that the petitioners relied upon their representations and conduct with respect to the classification of the lots purchased by the petitioners as "beach lots" and asking and receiving premium prices therefor from petitioners, it would be inequitable for the respondents thereafter to do — and they should be deemed estopped and be restrained from doing — that which would, if continued indefinitely, or to an unlimited extent, deprive the petitioners of the features of their lots which were the inducements for the purchase by them of such lots; particularly, when such actions by respondents would cause irreparable injury and damage to the petitioners, as shown *supra*. It is an application of the doctrine of estoppel first recognized or applied by this court in *Kamohai* v. *Kahele*, 3 Haw. 530. In this connection see *Fried* v. *Fisher*, 328 Pa. 497, 196 Atl. 39; see also annotation in 115 A. L. R. 152, citing many cases wherein estoppel has been predicated upon promises or assurance as to future conduct.

The appeal is sustained, the decision of the said chancellor and the decree appealed from are set aside, this opinion reversing same being effective in lieu thereof.

The cause is remanded with instructions to the judge of the circuit court, first circuit, who shall by assignment exercise jurisdiction therein, to proceed in accordance with this opinion and to issue such an injunction as may be appropriate and conformable to this opinion, whereby

the respondents Makaha Valley Farms, Ltd., Waianae
Village Properties, Ltd., and Capital Investment Co., Ltd.,
and each of them, its agents, servants, officers, employees,
affiliates, subsidiaries and assigns, shall be restrained and
enjoined from so digging or removing, or authorizing to
be dug or removed, as heretofore or otherwise, sand from
the beach and property hereinbefore referred to as lot
K-1-A, whereby the petitioners' aforesaid lots 195 and 196,
or either of them, of the subdivision at Makaha, City and
County of Honolulu, Territory of Hawaii, or the general
Makaha Beach area, referred to *supra*, will suffer unnat-
ural depletion and prospectively cause irreparable injury
and damage — as herein defined and found would result —
to the petitioners.

*John E. Parks* (also on the brief) for petitioners-
appellants.

*Robert G. Dodge* (*Heen, Kai, Dodge & Lum* on the
brief) for respondents-appellees.

### CONCURRING OPINION OF STAINBACK, J.

I concur in the conclusion of the opinion so ably and
exhaustively above set forth.

One who by removing sand from his own property
causes damage to the adjacent land is liable therefor on
the doctrine of lateral support and this is true even though
the carrying away of the sand from the petitioners' beach
was not caused solely by the removal by respondents of
sand from their own lot but by such act combined with the
action of the wind and the waves upon the sandy beach. If
it is reasonably apparent that by the excavation of the soil
by the respondents on their own lot damage would result
by gravitation or wave motion in the removal of the adjoin-
ing soil, respondents are liable for resulting damages.
While a person ordinarily may remove and sell soil and
sand and make any use of his property for which it is

reasonably fit, the common-law maxim of *sic utere tuo ut alienum non laedas* is particularly applicable in the present case.